UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Jennifer McCabe

    v.                             Civil No. 10-cv-558-LM

Liberty Life Assurance
Company of Boston


**O R D E R**


    Jennifer McCabe, a participant in an employee benefit plan
governed by the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. §§ 1001-1461, challenges a decision by
Liberty Life Assurance Company of Boston ("Liberty Life") to
deny her claim for long-term disability benefits.  Both parties
have moved for judgment on the administrative record.  For the
reasons that follow, Liberty Life's motion is granted, and
McCabe's motion is denied.


**The Legal Standard**

    The employee benefit plan under which McCabe seeks benefits
provides that "Liberty Life as the Claims Administrator and
insurer of Plan benefits, has the authority, in its sole
discretion, to construe the terms of the Plan and insurance
policy with respect to claim determinations and to determine
eligibility for benefits thereunder."  Administrative Record
(hereinafter "AR"), at 14; see also AR at 47.  "When an ERISA

plan gives an administrator discretionary authority to determine eligibility for benefits or construe the plans terms, the district court must uphold the administrator's decision unless it is 'arbitrary, capricious, or an abuse of discretion.'"  D&H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011) (quoting Cusson v. Liberty Life Assur. Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010); citing Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)).  Under that standard of review, a "decision to deny disability benefits [should be upheld] 'if there is any reasonable basis for it.'" Medina v. Metro. Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009) (quoting Wallace v. Johnson & Johnson, 585 F.3d 11, 14-15 (1st Cir. 2009)).

With regard to how a plan administrator may exercise his or her discretion, the First Circuit has "held that an ERISA benefit determination is within the discretion of a plan administrator so long as it is reasoned and supported by substantial evidence."  D&H Therapy, 640 F.3d at 35 (citation and internal quotation marks omitted).  "Evidence is substantial when it is reasonably sufficient to support a conclusion." Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) (citation and internal quotation marks omitted).  Moreover, "[e]vidence contrary to an administrator's decision does not make the decision unreasonable, provided

substantial evidence supports the decision." Wright, 402 F.3d at 74 (citations omitted).  In short, "under the applicable standard of review, the question is 'not which side [the court] believe[s] is right, but whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor.'" Matías-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003) (quoting Brigham v. Sun Life of Can., 317 F.3d 72, 85 (1st Cir. 2003); citing Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003); Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 6 (1st Cir. 2003); Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)).

## Background

The following summary of the relevant facts is drawn from the parties' Joint Statement of Material Facts, document no. 11, and from the Administrative Record.

Up until April 22, 2009, McCabe was employed by Liberty Mutual Insurance Company ("Liberty Mutual") as a disability case manager, a sedentary job.  As a Liberty Mutual employee, McCabe participated in the Liberty Mutual Long-Term Disability Plan (the "Plan"), which is administered by defendant Liberty Life and funded by a group disability income policy issued by Liberty Life.  The Plan provides that long-term disability "[b]enefits are payable for up to 18 months if [a employee is] unable to

perform all of the Material and Substantial Duties of [her] Own
Occupation and thereafter, benefits are payable if the employee
is unable to perform, with reasonable continuity, the Material
and Substantial Duties of Any Occupation."  AR at 5.  The Plan
also includes the following relevant definition:

> **"Total disability," "Disability," "Totally disabled,"
> or "Disabled"** with respect to a covered employee
> means:
>
> - for the first 18 months of Long-Term
>   Disability, that the employee is unable to
>   perform all the Material and Substantial
>   Duties of his or her Own Occupation because
>   of Injury or Sickness; and
>
> - after 18 months of Long-Term Disability,
>   that the employee is unable to perform, with
>   reasonable continuity, the Material and
>   Substantial Duties of . . . Any Occupation
>   for which he or she is or becomes
>   reasonably fitted by training, education,
>   experience, age and physical and mental
>   capacity.

AR at 3 (emphasis in the original).

In January of 2005, a bone scan revealed a likelihood that
McCabe was suffering from left sacroiliitis.[1]  In 2006 and again
in 2008 she underwent surgery to fuse her sacroiliac joint.
Both procedures were performed by Dr. Peter Dirksmeier.
Thereafter, McCabe sought treatment for pain in the joint that
had been operated on, and was prescribed several different

---

[1] Sacroiliitis is "[i]nflammation of the sacroiliac joint."
Stedman's Medical Dictionary 1714 (28th ed. 2006).

medications, including Roxicodone (oxycodone),[2] Ultram (tramadol hydrochloride),[3] MS Contin (morphine sulfate),[4] and MSIR (morphine sulfate instant release).

On March 17, 2009, McCabe was seen by Physician Assistant Shelly Landry of the Seacoast Pain Institute of New England ("SPINE"). McCabe's chief complaint was "[l]eft low back pain." AR at 417. In her office note, PA Landry reported:

> She did recently have an office visit with Dr. Dirksmeier and I do have a dictation report from that office visit, which states that she is one year status post surgery and it appears that her re-fusion, once again, did not take. The first failed fusion was on 11/01/2006. The second failed fusion with instrumentation was on 02/04/2008. It also appears that the screws may be loosening. . . . She is having difficulty in regards to continued chronic pain and working because her job does primarily consist of sitting and she feels that she has to limit herself on her medications due to her job in order to stay clear headed.

AR at 417. Based on a physical examination, PA Landry reported that McCabe suffered from no acute distress, was nontoxic, and was alert and oriented x3. Id. She also reported a pain score of nine, an Oswestry score of fifty-two percent and a COMM score

---

[2] Oxycodone is a "narcotic analgesic often prepared with aspirin or acetaminophen." Id. at 1400.

[3] Tramadol hydrochloride is an "analgesic drug with a mechanism of action that is unusual in that one optic isomer exerts typical opioid-type effects and the other isomer interacts with the reuptake and/or release of norepinephrine and serotonin in nerve terminals." Id. at 2014.

[4] Morphine sulfate is the "major phenanthrene of opium . . . [u]sed as an analgesic, sedative, and anxiolytic." Id. at 1227.

of seven.[5]  She assessed McCabe as having "[l]eft SI joint pain status post failed fusion x2 with Dr. Dirksmeier," depression, and "[m]yofascial pain secondary to antalgic gait."[6]  Id.  Her plan was to "try to battle [McCabe's] chronic pain with narcotics."  Id.

A CT scan of McCabe's pelvis on March 24 yielded the following impressions: "1. Nonunion of the left sacroiliac joint as noted with extensive degenerative change.  2. The 2 horizontally oriented fixation screws do not appear to enter the sacral ala and are well positioned across the joint space."  AR at 419.

An April 14, 2009, office visit with PA Kristin Joltes at SPINE resulted in an office note that was largely consistent with the March 17 note, except that McCabe's pain score increased from nine out of ten to ten out of ten, and her Oswestry score increased from fifty-two percent to fifty-six percent.

McCabe stopped working on April 22, 2009.  She applied for, and was granted, short-term disability benefits under the Plan.  During its consideration of McCabe's claim for short-term

---

[5] An office note by Dr. James Hay indicates that the Oswestry disability index measures a patient's level of pain and that COMM scores measure the appropriateness of a patient's use of pain medication.  See AR at 284.

[6] "Antalgic" means "counteracting or avoiding pain, as in a posture or gait assumed so as to lessen pain."  Dorland's Illustrated Medical Dictionary 243 (31st ed. 2007).

disability benefits, Liberty Life had Christine Piechowiak

conduct a nurse review of McCabe's file.  In a notation that is

part of McCabe's Liberty Life claim file, Nurse Piechowiak

wrote:

> Based on the non union & debilitating pain despite
> increasing use of narcotics w/ a secondary condition
> of depression, a less than sedentary functional
> capacity is supported from 4/23/09 until her pain is
> controlled on meds or she undergoes & recovers from
> surgery or has a favorable response to a spinal cord
> stimulator.

AR at 90.  The notation quoted above is dated May 6, 2009.

There is no indication that Liberty Life ever included Nurse

Piechowiak's case-file notation with the medical records it

provided to the physicians it engaged to evaluate McCabe's

physical condition.

Once her short-term disability benefits ran out, McCabe

applied for long-term disability benefits.  Between the date on

which McCabe stopped working and the date on which she received

the initial unfavorable decision on her application for long-

term disability benefits, she: (1) continued her treatment at

SPINE, seeing several physician assistants and Dr. James Hay;

(2) participated in a work guidelines evaluation administered by

a physical therapist; (3) was seen by Dr. Paul Tornetta at

Boston Medical Center for her back pain; (4) underwent a

psychological evaluation; and (5) completed an Activities

Questionnaire.

The work guidelines evaluation indicated, among other things, that McCabe was capable of sitting only rarely, and that she had to stand up twice during a thirty-minute test of her ability to sit.  Michael DelloRusso, who conducted the work guidelines evaluation, summarized it this way:

> Subjectively, Jennifer reported elevations in her symptoms with almost all physical tests.  Her perceived abilities are all within the sedentary category.  A job description was not available for this patient.  She feels she would not be able to safely return to her job as a case manager due to the required amount of sitting.  She also states that the pain increases throughout the day and her concentration is affected by both pain and the medications she takes to control the pain. Objectively, she showed an obvious trend of limited weight bearing tolerance on the left lower extremity. This was observed with all standing tests.  She was unable to sit with proper ergonomic posture and consistently shifted her weight over to the right side, which would likely affect her ability to complete sitting tasks.

AR at 391.

An office note by Dr. Hay dated July 2, 2009, includes the following relevant observations on McCabe's subjective complaints:

> Her pain is really no different after all the treatment and 2 fusion attempts that she has had.  She is not able to work secondary to her pain.  . . .  She has had an orthopedic physical therapy work summary evaluation, and they really said that her recommended work level falls below the sedentary DOT physical demand level.  Coupled with her need for narcotic analgesics which does cause some sleepiness and thought difficulties, I really do not think that she is able to do any significant work at this time. . . .  Her COMM is 6, indicating that she is using her medication appropriately.  Her Oswestry disability

8

index is 60%, indicating that despite this she is
still in a significant amount of pain. . . .

AR at 284.  In the context of his plan for McCabe, Dr. Hay

stated: "At this point, I believe she is totally disabled based

upon her FCE [functional capacity evaluation] and incapable of

any meaningful employment."[7]  AR at 285.

In her Activities Questionnaire dated August 24, 2009,

McCabe reported that she needed a break after sitting for ten to

---

[7] There is substantial confusion in the record regarding
whether McCabe ever had a functional capacity evaluation.  Dr.
Hay referred to an FCE in his July 2 office note.  In his IME,
Dr. Glassman wrote: "Dr. Hay felt that she had a Functional
Capacity Evaluation, although we do not see the official FCE in
the record; only the Work Summary Assessment which is not the
same test."  AR at 256.  Dr. Hay responded:

> Dr. Glassman again references a Functional Capacity
> Evaluation that he could not find in the medical
> record.  Obviously Dr. Glassman is confused again in
> two areas.  We ask[ed] for and obtained work
> guidelines for the patient.  This is not an FCE; this
> is a work guidelines summary report, and this was
> performed over 3 physical therapy visits so as not to
> cost insurance more per production of this report.
> . . .  Certainly, if any insurance company wishes to
> provide funding for an FCE, I would be more than happy
> to concur and as long as the FCE is done by a fully
> independent organization.  This FCE, by the way, was
> done by a fully independent organization of which I
> have no financial ties, or indeed any ties, and felt
> that this provided an appropriate direction for the
> patient, and indeed what her work abilities were in a
> cost efficient manner.  Again, if Dr. Glassman feels
> strongly enough and therefore the insurance company is
> willing to pay for it, I will more than happily order
> an FCE to satisfy his concerns with this.  His
> reference[s] to the Functional Capacity Evaluation
> throughout therefore are inaccurate and should be seen
> in that regard.

AR at 243.

fifteen minutes, standing for ten to fifteen minutes, and walking for ten minutes.  She also reported needing to use a cane.  (On four occasions before she completed her Activities Questionnaire and on two more occasions afterward, medical professionals at SPINE, including Dr. Hay, noted that McCabe ambulated without any assistive device.)

To evaluate McCabe's claim, Liberty Life: (1) had Dr. David Monti, Jr., review McCabe's file; (2) commissioned surveillance of McCabe, to document her daily activities; (3) had Dr. Stuart Glassman conduct an independent medical evaluation ("IME") on McCabe; (4) informed McCabe of the surveillance it had done on her; and (5) sent forms titled "Attending Physician's Assessment of Capacity" to Drs. Dirksmeier and Hay, neither of whom completed those forms.[8]

Based on his review of McCabe's medical records, Dr. Monti determined, among other things, that McCabe was capable of "[c]ontinuously sitting with a change in position every 60 minutes for five minutes," AR at 300, and concluded that McCabe "would be able to work full time . . . in a sedentary work capacity," AR at 301, subject to certain limitations.[9]

---

[8] The form sent to Dr. Dirksmeier was returned with the notation "Per Jason D. Doran, PA-C can't complete without an FCE."  AR at 408.

[9] Specifically, Dr. Monti indicated that McCabe's impairment of low back pain secondary to sacroiliac joint dysfunction supported the following permanent limitations on her ability to

The surveillance of McCabe took place over more than forty hours spread across five days (October 1, 2, 3, 6, and 9, 2009). It resulted in more than fifty minutes of videotape and a thirteen-page report.  According to the report, McCabe: (1) once bent over at a forty-five degree angle to take a child's booster seat out of the back seat of her car; (2) participated in water aerobics on several occasions; (3) carried one or more small to medium sized items on several occasions; (4) once got down on her hands and knees to play with her daughter; and (5) walked with an observable limp and used a cane on only one of the five days she was observed, the day on which she went to see Dr. Glassman for her independent medical examination.  During a telephone call on October 30, a Liberty Life case manager reviewed the surveillance report with McCabe and indicated that it would be sent to Dr. Hay.  It is not clear from the record when McCabe and/or Dr. Hay received a copy of the surveillance report.  Liberty Life did, however, send McCabe a copy of the surveillance footage on December 16.

Based on his examination of McCabe, his review of the medical records, and his review of the report of the first three

---

perform work-related activities: (1) no lifting of more than twenty pounds occasionally and ten pounds frequently; (2) continuously sitting with a change in position every sixty minutes for five minutes; (3) walking/standing frequently with a change in position every sixty minutes for at least five minutes; (4) no limits on fingering, handling, or grasping; (5) no limits on use of the upper extremities; (6) occasional bending and stooping; and (7) no squatting.

days of surveillance (but not the footage), Dr. Glassman reached

the following relevant conclusions:

> [I]t is felt that a light-medium duty work capacity is
> appropriate for her.  Her functional capacity
> evaluation was not valid.  . . .  While she is having
> SI joint fusion performed apparently, her pain
> complaints appear to be more subjective than objective
> in nature.  She shows nonorganic pain behavior on
> examination, and I would expect that with a true valid
> effort, this claimant would be able to perform at
> least light to medium duty capability and eventually
> even medium duty capability full time.  She would be
> cleared for occasional bending, kneeling, squatting
> and climbing, with no other limitations being
> indicated.  There are no restrictions with sitting,
> standing or walking.

> . . . .

> [H]er pain complaints are felt to be more subjective
> than objective in nature.  While there is evidence
> that she had surgery, her pain complaints cannot be
> supported by the record review or physical examination
> today.  She shows nonorganic pain behavior including
> superficial over-reactivity and distraction testing.
> She has no evidence of any disuse atrophy of the left
> leg compared to the right leg and no evidence of any
> skin changes over the left SI region compared to the
> right side.

> . . . .

> Her clinical findings on examination today during the
> IME do not correlate with her pain complaints.

AR at 260-61.

Liberty Life gave Dr. Hay an opportunity to comment on Dr.

Glassman's report.  He did so by letter, and also provided an

office note.  (Among other things, Dr. Hay explained why he, in

contrast with Dr. Glassman, attached little significance to the

fact that McCabe did not use an assistive device when she

12

visited SPINE.)  In addition, McCabe submitted her own lengthy
rebuttal plus further information, including some medical
records.  Dr. Glassman, in turn, responded to the information
provided by Dr. Hay and McCabe, and indicated that his opinion
remained unchanged.

By letter dated December 4, 2009, and signed by Senior
Disability Case Manager Jeanne Teraila, Liberty Life denied
McCabe's claim for long-term disability benefits.  In its
letter, Liberty Life relied upon, and quoted extensively from,
the reports provided by Drs. Monti and Glassman.  The letter
concluded:

> Your occupation as a disability case manager requires
> that you investigate, analyze, and determine the
> extent of an insurance company's liability for claims,
> correspond with claimants and medical specialists, and
> calculate/approve benefit payments.
>
> Medical review of your file including an Independent
> Medical Examination has outlined a work capacity which
> is compatible with the requirements of your
> occupation.  Based on the medical information in
> relation to your occupation[al] requirements, you are
> able to perform the duties of your Own Occupation.
> Therefore, you do not meet your Policy's definition of
> disability, and we must deny your claim for benefits.

AR at 190.  Liberty Life did not refer to the surveillance in
its December 4 letter.

In April of 2010, McCabe appealed Liberty Life's denial of
benefits.  The thrust of her appeal was that: (1) her sacroiliac
joint pain prevented her from sitting for more than fifteen
minutes at a time and limited her ability to concentrate; and

(2) the pain medication she needed to take further eroded her ability to concentrate.  In support of her appeal, she presented a February 4, 2010, letter from Dr. Dirksmeier and a March 12 letter from Dr. Hay.  Dr. Dirksmeier wrote:

> Jennifer McCabe . . . has had debilitating left low back, hip, thigh and groin pain since 2002.  She has been very compliant with all recommended treatments. She has undergone extensive activity modification, rest, extensive physical therapy and all imaginable forms of medications to include nonsteroidal anti-inflammatory medications, muscle relaxants, pain medications of all forms and now escalating narcotic management with only a modicum of benefit. . . .
>
> Jennifer unfortunately, is left with a debilitating painful problem that affects all aspects of her life. She has attempted to work throughout her debility to the best of her ability but now is incapable of doing so as she cannot sit, stand or walk comfortably.  She is requiring high dose narcotic analgesics.  I would support her application for Social Security disability.

AR at 166.  In his letter, Dr. Hay took issue with Dr. Glassman's IME and also noted:

> The only thing that has been found to give [McCabe] any respite or benefit from [her] pain is the use of very potent opioid medications.  Unfortunately, side effects of these medications include sedation and memory difficulties, and since there are no other therapies available to her the chronic utilization of opioids to control her pain is expected to continue indefinitely unless another new therapy or intervention is discovered.  Because of the sedation from the opioid medicines and the cognitive or thought process difficulties that these typically provide, as well as her inability to be able to stand or sit for periods of time because of this nonunion or "broken bone" in the back, she is unable to really have a functional work ability.

Tr. at 164.  Dr. Hay concluded:

14

> All in all, as a physician who has treated pain
> patients for almost 20 years, I find this woman to be
> appropriate, non-malingering and very real in her
> complaints of pain.  She is unable to function in a
> work-related environment and has done everything any
> treating physician has asked her to do in attempting
> to get her better.  Unfortunately, with the exception
> of medication management at present, these have been
> unable to resolve her pain and she is, as a result,
> left with incapacitating pain with this nonunion of
> the sacroiliac joint or "broken bone" that cannot be
> fixed, but only be palliated.

Id.

As a part of the appeal process, Dr. Mark Kaplan conducted

an independent peer review of McCabe's case, which resulted in a

report dated May 28, 2010.  Dr. Kaplan indicated that he

contacted Dr. Dirksmeier, but was unable to contact Dr. Hay,

despite phoning his office four times.  With regard to the

former, Dr. Kaplan reported:

> I discussed the case at length with Dr. Dirksmeier.
> The claimant is status post treatments including two
> surgeries as described above.  She has no weight-
> bearing restriction.  She does not use an assistive
> device when ambulating.  Dr. Dirksmeier agreed that
> the claimant's impairment is that of pain without
> neurologic or other dysfunction.

AR at 148.  By letter dated May 28, 2010, i.e., the date of his

report, and sent by FAX on June 1, Dr. Kaplan forwarded the

foregoing summary of his consultation with Dr. Dirksmeier to Dr.

Dirksmeier for verification and correction, with a requested

return within ten business days.  In a FAX dated June 17, 2010,

Dr. Dirksmeier corrected the summary to read:

> I discussed the case at length with Dr. Dirksmeier.
> The claimant is status post treatments including two
> surgeries as described above.  She has no weight-
> bearing restriction.  She uses a cane when ambulating
> with increasing frequency.  Dr. Dirksmeier agreed
> that the claimant's impairment is that of pain
> without neurologic dysfunction.  She has significant
> functional limitations however.  (See accompanying
> letter dated 2/4/10.)

AR at 118.  The letter of February 4 to which Dr. Dirksmeier

referred is among the documents listed in the "Summary of

Medical Documentation" section of Dr. Kaplan's report.

In his report, Dr. Kaplan reached the following

conclusions:

> Her current condition might be best described as a
> "failed sacroiliac joint syndrome" similar to what is
> referred to as a failed back syndrome.
>
> Her impairment is that of chronic pain without
> neurologic dysfunction or medically necessary
> orthopedic limitation.
>
> Since pain is subjectively reported, in a case such as
> this one it is imperative to obtain collateral
> information in order to assess the impact of pain on
> the individual's function.
>
> In this case, surveillance video is reported to have
> shown the claimant ambulating without an antalgic gait
> and performing bending maneuvers inconsistent with her
> endorsed degree of disability.  The actual video,
> however, was not provided.

AR at 149.  Dr. Kaplan also concluded that: (1) McCabe was

capable of sitting with a ten-minute break every two hours; (2)

the claimed cognitive side effects of McCabe's medication have

not been adequately assessed; (3) the limitations stated by

McCabe's treating physicians were not consistent with the

medical evidence; and (4) McCabe had the capacity to sustain
full-time work, with the following restrictions: (a) lifting is
limited to no more than twenty-five pounds, not more than
fifteen times per hour; (b) no squatting; (c) standing or
walking with a ten-minute break every one hour; (d) sitting with
a ten-minute break every two hours; (e) extremes of flexion or
extension allowed up to four times per hour; (f) no extremes of
twisting; (g) no climbing ladders; (h) driving a car or light
truck up to a full work day; and (i) no repetitive asymmetric
motions such as sweeping or shoveling.

    On May 28, McCabe submitted to Liberty Life a notarized
statement describing conversations she had with Brian Turner of
the Liberty Mutual human resources department concerning the
inclusion of certain information in her Liberty Life claim file.
Specifically, McCabe sought to include the observations of her
Liberty Mutual manager concerning her "ever increasing pain &
somnolence resulting from [her] pain medications, as well as the
decline in [her] performance due to [her] inability to think
clearly."  AR at 136.  McCabe's statement asserts that despite
assurances from Turner, her Liberty Mutual manager's
observations never made it into her Liberty Life claim file.

    By letter dated June 3, 2010, and signed by Appeal Review
Consultant Lindsay Mack, Liberty Life rejected McCabe's appeal
and upheld its previous denial of long-term disability benefits.

Like the initial denial, the decision on McCabe's appeal cited the reports of Drs. Monti and Glassman, and it also referred to the surveillance and Dr. Kaplan's independent peer review. After Liberty Life denied her appeal, McCabe raised various concerns about the appeal process.  Specifically, she complained about several items missing from her case file and the fact that Liberty Life denied her appeal before the date by which Dr. Kaplan had asked Dr. Dirksmeier to correct and return the summary of their consultation.  In addition, she submitted a letter from Dr. Hay taking issue with Dr. Kaplan's description of his failed attempts to contact him.  By letter dated September 9, 2010, Liberty Life indicated that the material McCabe submitted did not change its position, that McCabe's claim would remain closed, and that she had exhausted her administrative remedies under ERISA.

This action followed.  McCabe claims that Liberty Life erroneously denied her claim for long-term disability benefits, and asks the court to award her those benefits, along with attorneys' fees and costs.

**Discussion**

Both parties move for judgment on the administrative record.  In her motion, McCabe argues that Liberty Life's denial of coverage was arbitrary and capricious because:

18

(a)   Liberty Life relied on Dr. Kaplan's report, even
      though: (1) Dr. Hay disputes Dr. Kaplan's
      statements about Dr. Kaplan's alleged inability
      to contact him; and (2) Dr. Kaplan's report
      inaccurately characterized his consultation with
      Dr. Dirksmeier, and Dr. Kaplan issued his report
      before giving Dr. Dirksmeier an opportunity to
      correct that inaccuracy;

(b)   information from McCabe's manager at Liberty
      Mutual concerning her decline in health and
      performance was not included in her personnel
      file or provided to McCabe's counsel when she
      requested it;

(c)   McCabe was not given a full and fair opportunity
      to respond to the surveillance footage before
      Liberty Life decided to deny her claim;

(d)   Liberty Life's in-house nurse case manager
      stated, in reference to McCabe's claim for short-
      term disability benefits, that McCabe would be
      disabled from even sedentary work until her pain
      was controlled by medication, she received and
      recovered from further surgery, or she obtained
      positive results from a spinal-cord stimulator,
      none of which has yet to happen;

(e)   Dr. Glassman's IME demonstrates bias in favor of
      Liberty Life;

(f)   the denial of coverage is contrary to the
      findings of the work guidelines evaluation;

(g)   the denial of coverage is based on conclusions
      that McCabe is able to sit for extended periods,
      while her treating physicians all agree that
      sitting causes her pain that increases over time,
      and her disability due to pain has been
      documented by means of her Oswestry index; and

(h)   Liberty Life operated under a conflict of
      interest.

Following the analytical scheme employed in Cusson, the court

begins with the asserted conflict of interest and then

considers, as necessary, any remaining issues.  <u>See</u> 592 F.3d at 224-28.

## A. Conflict of Interest

McCabe notes that Liberty Life, as both the insurer and administrator of the Plan, operates under an inherent conflict of interest.  As evidence of that conflict, she identifies Liberty Life's: (1) reliance on the reports provided by Drs. Glassman and Kaplan; (2) disregard of the opinion of its in-house nurse case manager; (3) failure to document her Liberty Mutual manager's observations about her decline in health and performance; and (4) failure to give her an opportunity to respond to the surveillance footage before rendering the decision communicated in the letter of December 4, 2009.  In McCabe's view, the court should give Liberty Life's conflict of interest relatively heavy weight when determining whether Liberty Life's denial of benefits was arbitrary or capricious. Liberty Life disagrees.

### 1. Legal Principles

"Although the presence of a conflict of interest does not change the standard of review . . . the conflict itself can, under certain circumstances, be accorded extra weight in the court's analysis."  <u>Cusson</u>, 592 F.3d at 224.  The <u>Cusson</u> court elaborated:

>       In [Metropolitan Life Insurance Co. v.] Glenn, [554
>       U.S. 105 (2008),] the Supreme Court held that "[t]he
>       conflict of interest at issue . . . should prove more
>       important (perhaps of great importance) where
>       circumstances suggest a higher likelihood that it
>       affected the benefits decision, including, but not
>       limited to, cases where an insurance company
>       administrator has a history of biased claims
>       administration." [Id. at 117.] On the other hand,
>       the conflict "should prove less important (perhaps to
>       the vanishing point) where the administrator has taken
>       active steps to reduce potential bias and to promote
>       accuracy." Id.
>
>       We have interpreted this language from Glenn to
>       mean that "courts are duty-bound to inquire into what
>       steps a plan administrator has taken to insulate the
>       decisionmaking process against the potentially
>       pernicious effects of structural conflicts." Denmark
>       [v. Liberty Life Assur. Co. of Boston], 566 F.3d [1,]
>       9 [(1st Cir. 2009)].

Id. That said, McCabe "bears the burden of showing that the

conflict influenced [Liberty Life]'s decision." Id. at 225

(citing Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir. 1998)).

## 2. Purported Evidence of a Conflict of Interest

Here, as with the claimant in Cusson, McCabe has not

challenged "the adequacy of [Liberty Life]'s internal procedures

to insulate the review process from the conflict."[10] 592 F.3d at

225. Accordingly, the court turns to the evidence McCabe has

adduced to support her assertion that Liberty Life's decision on

her claim was tainted by a conflict of interest.

---

[10] While neither party in Cusson briefed the issue of
internal procedures, Liberty Life actually does address that
issue, pointing out its retention of independent physicians and
its use of an appeal unit that is separate from the unit that
made the initial decision to deny McCabe's claim.

a. Dr. Glassman's Report

McCabe argues that Liberty Life's conflict of interest is demonstrated by its reliance on the report from Dr. Glassman's independent medical examination because that report demonstrates bias in favor of Liberty Life.  Specifically, McCabe objects to Dr. Glassman: (1) opining that her pain complaints were more subjective than objective in nature without indicating what would constitute objective pain complaints; (2) stating that her treatment plan is inappropriate without saying what would be an appropriate treatment plan; and (3) saying that she demonstrated nonorganic pain behavior without saying how she did so.  McCabe also cites various criticisms of Dr. Glassman by Dr. Hay and a New Hampshire Supreme Court opinion, In re Dean Foods, 158 N.H. 467, 470 (2009), in which the New Hampshire Compensation Appeals Board found one of Dr. Glassman's assessments to be "incongruous" with an assessment he had made one year earlier in the same case.

McCabe's first set of criticisms of Dr. Glassman's report, like one set of arguments advanced by the claimant in Morales-Alejandro v. Medical Card System, Inc., 486 F.3d 693 (1st Cir. 2007), appears to misplace the burden of proof, see id. at 700. In Morales-Alejandro, the claimant attacked the plan administrator's denial of benefits on grounds that the record on which the plan administrator relied lacked various items of

evidence.  See id.  The court of appeals found that argument
unpersuasive: "Morales's arguments show that he fails to
understand that it is his responsibility to prove his claim.  A
claimant seeking disability benefits bears the burden of
providing evidence that he is disabled within the plan's
definition."  Id. (citation omitted).

Likewise here, Dr. Glassman's purported failure to provide
evidence on objective pain complaints, appropriate treatment
plans, and signs of nonorganic pain behavior does not undermine
the evidentiary value of his opinions on the subjectivity of
McCabe's pain complaints, the inappropriateness of her treatment
plan, and her nonorganic pain behavior.  In addition, McCabe's
assertion that Dr. Glassman did not say how she demonstrated
nonorganic pain behavior is factually incorrect; his report
states that "she shows nonorganic pain behavior including
superficial over-reactivity and distraction testing."

Moreover, the fact that Dr. Hay does not agree with Dr.
Glassman is of no moment.  It is well established in the ERISA
context "that the existence of medical evidence pointing in two
directions does not render arbitrary or capricious a plan
administrator's decision to credit one viewpoint or the other."
Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 28 (1st
Cir. 2005) (citing Leahy v. Raytheon Co., 315 F.3d 11, 19 (1st
Cir. 2002); Vlass v. Raytheon Emps. Disability Trust, 244 F.3d

27, 32 (1st Cir. 2001); <u>Gannon</u>, 360 F.3d at 213.  In addition,
Dr. Hay's belief that Dr. Glassman had never found anything
wrong with a patient, on which McCabe relies, is actually
contradicted by the case McCabe cites, <u>Dean Foods</u>, in which Dr.
Glassman issued two reports, the first of which found the
claimant to have a permanent five-percent whole-person
impairment.  158 N.H. at 469.  While that was less than the
thirteen-percent impairment found by the other doctor in the
case, <u>see</u> <u>id.</u>, it cannot be said that Dr. Glassman found there
to be <u>nothing</u> wrong with the claimant in <u>Dean Foods</u>.

In sum, McCabe has identified no error in the plan
administrator's reliance on Dr. Glassman's report.  Necessarily,
then, that reliance does not demonstrate a conflict of interest
on Liberty Life's part.

### b. Dr. Kaplan's Report

McCabe argues that Liberty Life's conflict of interest is
demonstrated by its reliance on the report from Dr. Kaplan's
independent peer review because: (1) Liberty Life failed to
follow up on Dr. Kaplan's claim that he was unable to contact
Dr. Hay; and (2) Dr. Kaplan issued his report before Dr.
Dirksmeier responded to the FAX requesting verification of Dr.
Kaplan's summary of his consultation with Dr. Dirksmeier.
Liberty Life contends that the issues McCabe raises are
immaterial at best, as Dr. Kaplan was fully aware of the

opinions of Drs. Hay and Dirksmeier, based upon various office notes and other documents he reviewed.  The court agrees.

Dr. Kaplan reported that he made four unsuccessful attempts to contact Dr. Hay to discuss McCabe's claim.  In a letter submitted by McCabe to Liberty Life after it denied her appeal, Dr. Hay asserts that the attempted contacts Dr. Kaplan described could not have happened the way he said they did.  Dr. Hay based that assertion on his own knowledge of his office's internal procedures.  Notwithstanding the lack of a consultation with Dr. Hay, the fact remains that Dr. Kaplan had access to numerous medical records generated by Dr. Hay and the physician assistants in his practice spanning several years.  As a physician himself, Dr. Kaplan was certainly competent to review Dr. Hay's records without the benefit of a consultation.

In any event, McCabe identifies no authority for the proposition that a plan administrator acts arbitrarily and capriciously by relying on an independent peer review when the physician preparing the review does not directly consult with the physician(s) whose work he or she is reviewing. Necessarily, then, McCabe provides no legal support for the more attenuated proposition on which she relies, i.e., that Liberty Life acted arbitrarily and capriciously by failing to inquire into and resolve the disagreement between Drs. Kaplan and Hay

concerning whether or not Dr. Kaplan actually took the steps he said he took to contact Dr. Hay.

McCabe also raises concerns about Liberty Life's denying her appeal before it had the benefit of Dr. Dirksmeier's corrections to Dr. Kaplan's characterization of their consultation.  Regardless of any timing mishap on the part of Dr. Kaplan, Liberty Life, or Dr. Dirksmeier,[11] the fact remains that in its letter of September 9, 2010, Liberty Life expressly took into account the entirety of Dr. Dirksmeier's response to Dr. Kaplan's report.  Moreover, as Liberty Life points out, the primary content of Dr. Dirksmeier's response, i.e., the copy of the February 4 letter he included with his corrections, was listed in the May 28 report as one of the documents Dr. Kaplan examined when he conducted his review.

To summarize, Liberty Life's reliance on Dr. Kaplan's independent peer review is not evidence of a conflict of interest.

---

[11] McCabe complains that Liberty Life issued its decision denying her appeal on June 3, seven days before the end of the ten days Dr. Kaplan gave Dr. Dirksmeier to respond to his request for confirmation and correction.  But, even if Liberty Life had waited until June 10 to issue its decision on McCabe's appeal, it still would not have had Dr. Dirksmeier's corrections, because he did not transmit them to Dr. Kaplan until June 17.  As the First Circuit explained with regard to a similar set of circumstances in Medina, "[i]f, as we have already observed, an administrator is not obliged to place particular weight on the opinion of a claimant's treating physician, then we cannot see how an administrator could have an obligation to wait indefinitely for an opinion that is not forthcoming."  588 F.3d at 47.

### c. The In-House Nurse's Opinion

McCabe argues that Liberty Life's conflict of interest is demonstrated by its disregard for the opinion of its own in-house reviewing nurse, Christine Piechowiak.  Liberty Life contends that when making a decision on a claim for long-term disability benefits, it was not bound by the opinion of a nurse that was rendered while she was reviewing a claim for short-term disability benefits.  Liberty Life further points out that at the time Nurse Piechowiak offered her opinion, the surveillance footage had yet to be recorded and the reports of Drs. Monti, Glassman, and Kaplan had yet to be written, which means that Nurse Piechowiak had far less evidence to consider than Liberty Life had before it when it made the decisions at issue here.

McCabe's concern is that Nurse Piechowiak's notation in her claim file was not mentioned in either of Liberty Life's two decision letters or in any of the doctors' reports on which Liberty Life relied.  Regarding the latter, presuming that Liberty Life did not provide Nurse Piechowiak's notation to Drs. Monti, Glassman, and Kaplan, the court cannot say that Liberty Life acted in an arbitrary and capricious manner.  That notation was based solely on a review of McCabe's medical records, and it is difficult to see how a nurse's record review would have much relevance to physicians conducting their own record reviews (i.e., Drs. Monti, Glassman, and Kaplan), or to a physician

27

performing an IME (i.e., Dr. Glassman).  McCabe also faults
Liberty Life for failing to consider Nurse Piechowiak's
notation.  Given that Nurse Piechowiak's notation appears in a
Liberty Life case file, it would be difficult to conclude that
Liberty Life did not consider it.  To be sure, neither of the
decision letters mentions the notation, but then, again, if
Liberty Life was under no "discrete burden of explanation when
[it] credit[ed] reliable evidence that conflict[ed] with a
treating physician's evaluation," Medina, 588 F.3d at 46, it was
surely under no burden to explain why it chose to credit the
opinions of Drs. Monti, Glassman, and Kaplan over the
conflicting opinion of a nurse who merely reviewed McCabe's
medical records.

     Stated simply, there is nothing in Liberty Life's handling
of Nurse Piechowiak's claim-file notation to support a
determination that Liberty Life was operating under a conflict
of interest.

          d. Supervisor's Observations

     McCabe argues that Liberty Life's conflict of interest is
demonstrated by its failure to include in her claim file
information from her Liberty Mutual manager, and purportedly
provided to Liberty Life by Brian Turner of Liberty Mutual's
human resources department.  Liberty Life contends that: (1)
McCabe failed to raise this issue in a timely and effective way

during the appeal process, even though she knew of the alleged absence of the information at issue in February of 2010; and (2) the information itself is, at best, minimally relevant.

As with Nurse Piechowiak's notation, McCabe's Liberty Mutual manager's observations concerning the limiting effects of her pain and her pain medication are of minimal relevance. Among other things, those observations predated a substantial number of medical records and opinions, including those on which Liberty Life relied when rendering its decisions.  Even if McCabe's Liberty Mutual manager's observations had been included in her claim file, Liberty Life would not have acted arbitrarily and capriciously in denying McCabe's claim.  Accordingly, even if Turner did transmit McCabe's Liberty Mutual manager's observations to McCabe's Liberty Life disability-claim case manager – a fact on which McCabe relies but which is not adequately established in the record due to several layers of hearsay[12] – Liberty Life's failure to place those records in McCabe's case file would not be evidence of a conflict of interest.

---

[12] Regarding that factual matter, the record consists only of a notarized statement by McCabe that she spoke with Turner who told her that he had told her disability-claim case manager, Jeanne Teraila, what McCabe's Liberty Mutual manager had told him about her impression of the effects of McCabe's pain and pain medication on her job performance.

e. Surveillance Evidence

McCabe argues that Liberty Life's conflict of interest is demonstrated by its failure to give her a full and fair opportunity to respond to the surveillance of her before relying on it to deny her claim.  Liberty Life points out that McCabe was sent a copy of the surveillance footage approximately four months before she filed her appeal, giving her ample opportunity to respond to it.

McCabe identifies no authority for the proposition that she had any right to respond to the surveillance findings. Presuming, however, that she did have such a right, both the contours of that right and the manner in which it was allegedly violated in this case are unclear, at best.  Factually: (1) the surveillance was completed on October 9, 2009; the surveillance report is dated October 12; (3) Liberty Life received the surveillance report and the footage by October 21; (4) a Liberty Life case manager discussed the report with McCabe by telephone on October 30, and indicated that the report would be sent to Dr. Hay; (5) McCabe explained to the case manager that she was able to do the things documented in the surveillance report because of the medication she was taking; and (6) on December 16, Liberty Life sent McCabe a copy of the surveillance footage. The surveillance findings were used in the following ways: (1) in his IME, Dr. Glassman summarized the report for the first

three days of surveillance, and in his conclusions, noted that the report indicated that McCabe did not use an assistive device for walking and that she was able to perform some lifting maneuvers; (2) the initial denial letter did not mention the surveillance, relying on it only to the extent that its author relied on Dr. Glassman's IME; and (3) the letter denying McCabe's appeal noted that the surveillance showed McCabe on multiple occasions walking in a fluid manner without a visible support device and showed her getting down on her hands and knees without assistance to play with her child late on the one day she did use a cane, i.e., the day of her IME with Dr. Glassman.

Given that McCabe offered an explanation for the surveillance findings during the October 30 telephone conversation and that Liberty Life gave McCabe a copy of the surveillance footage approximately four months before she appealed the initial denial of benefits, it is difficult to discern precisely what McCabe is referring to when she argues that Liberty Life relied on the surveillance without giving her an opportunity to respond to it. Moreover, while McCabe says she was prejudiced by not having the chance to see the surveillance footage before Liberty Life issued its initial denial, the denial letter did not refer to either the surveillance or the footage, and Dr. Glassman, who relied on the

surveillance findings to a minor extent, had not seen the footage either.  Finally, the court notes that McCabe said nothing about Liberty Life's reliance on the surveillance findings in the letter by which she appealed the initial denial of coverage.

Liberty Life's handling of the surveillance findings and footage does not demonstrate any conflict of interest.  A Liberty Life case manager discussed the findings with McCabe before it made its initial determination and provided her with the footage before any Liberty Life decisionmaker relied on it.

### f. Summary

McCabe has identified five factors that, in her view, demonstrate Liberty Life's conflict of interest.  Because the court finds none of those arguments persuasive, it concludes that Liberty Life's decision was not "improperly influenced by its structural conflict of interest."  Cusson, 592 F.3d at 228.  Accordingly, the court accords "no special weight to the conflict in [the] analysis of whether [Liberty Life]'s decision was proper, but rather consider[s] it along with all of the factors present in this case to determine if [Liberty Life]'s ultimate conclusion regarding [McCabe]'s benefits was 'reasoned and supported by substantial evidence.'"  Id. (quoting Gannon, 360 F.3d at 213).

B. McCabe's Remaining Issues

McCabe argues that the five factors discussed above demonstrate both that Liberty Life's decision was affected by a conflict of interest and that the decision was arbitrary and capricious.  As in Cusson, the court's reasons for determining that those factors do not demonstrate a conflict of interest also support the court's conclusion that those factors are not indicia of a decision that was arbitrary and capricious.  See 592 F.3d at 228.  Accordingly, the court turns to the two remaining aspects of Liberty Life's decision that, in McCabe's view, show that it was arbitrary and capricious.

1. The Work Guidelines Evaluation

McCabe argues that Liberty Life's decision was arbitrary and capricious because it conflicts with the findings of the work guidelines evaluation conducted in May of 2009.  More specifically, she contends that

> [b]ecause neither Dr. Glassman nor Dr. Kaplan
> accurately or adequately disputed the findings in the
> work guidelines report, and no similar examination was
> ever conducted to contradict the findings of the May
> 2009 report, Liberty Life's rejection of those
> findings and adoption of the less-stringent work
> restrictions identified by Dr. Glassman and Dr. Kaplan
> was arbitrary and capricious.

Pl.'s Mot. for J. on the Admin. R. (doc. no. 13), at 20.

As a preliminary matter, the court rejects the premise that Drs. Glassman and Kaplan had an obligation to refute the findings of the work guidelines evaluation; if courts cannot

"impose on plan administrators a discrete burden of explanation," Medina, 588 F.3d at 46, then a medical expert's alleged failure to carry such a burden does not undermine the competence of his or her opinion.  Accordingly, the court also rejects the premise that Liberty Life was required to treat the work guidelines evaluation as controlling in the absence of a persuasive refutation of it.  A plan administrator's decision is not arbitrary and capricious simply because the record contains contrary evidence, even when that evidence is not expressly refuted.  See Wright, 402 F.3d at 72.  Finally, if McCabe is arguing that Liberty Life was under some obligation to commission an assessment such as a functional capacity evaluation to contradict the work guidelines evaluation, she is mistaken.  See Morales-Alejandro, 486 F.3d at 700.

Here, it is indisputable that both Dr. Glassman and Dr. Kaplan read the work guidelines evaluation.  For his part, Dr. Glassman expressly took issue with it, registering his opinion that it fell short of being a true functional capacity evaluation and that it lacked validity testing documentation and authenticity.[13]  He also questioned the validity of the results based on his reading of the evaluation as stating that McCabe's effort was submaximal.  To be fair, the evaluation may not have

_____

[13] Dr. Glassman was not alone in questioning the validity of the work guidelines evaluation; Dr. Monti also noted that it lacked validity testing, and he found it to contain inconsistencies.

characterized McCabe's effort as submaximal, but on the other
hand, the form on which the results of the work guidelines
evaluation were reported is far from a model of clarity on that
point.

In any event, this is not a situation such as that
presented in Buffonge, where the court of appeals reversed the
district court's judgment in favor of the plan administrator.
In Buffonge, the plan administrator relied on two pieces of
evidence the court found to be fundamentally unreliable.  First,
the plan administrator relied on a doctor's "conclusion that 'a
consensus exists' that Buffonge could perform a desk job," 426
F.3d at 29, when the record included at least four doctors'
reports reaching exactly the opposite conclusion, id.  Second,
the plan administrator interpreted a doctor's report deeming
Buffonge "disabled from any gainful employment at the present
time," id., as saying that Buffonge was capable of working, and
supported that conclusion by construing a list of activities the
doctor said Buffonge could not perform as implying that Buffonge
could perform activities not specifically listed, id.  As the
court of appeals explained, "we cannot say that a decision
relying on multiple pieces of faulty evidence was 'reasoned.'"
Id. at 30.  Here, by contrast, while Drs. Glassman and Kaplan
disagree with the conclusions of the work guidelines evaluation,
they do not abjectly mischaracterize that report in the way Dr.

Rutchik misstated the record in Buffonge.  And, the plan administrator here engaged in none of the verbal gymnastics that Prudential performed in Buffonge.

In short, the court detects nothing in the way Dr. Glassman, Dr. Kaplan, or the plan administrator treated the work guidelines evaluation that would cause the court to find Liberty Life's denial of benefits to be arbitrary and capricious.

### 2. McCabe's Ability to Sit

McCabe argues that Liberty Life's decision was arbitrary and capricious because "it is based on the assertion that [she] is able to sit for extended durations, although all of her treating physicians agree that her pain increases with sitting and that pain level has been documented through Oswestry Disability Index testing."  Pl.'s Mot., at 4.  Liberty Life contends that: (1) the treating-physician opinions on which McCabe relies are little more than her doctors' recapitulations of her own subjective statements about pain; (2) it was entitled to obtain and rely on the opinions of consulting physicians; and (3) it also relied on collateral information, in the form of the surveillance findings, that supported the conclusions of the medical opinions on which it relied.

With regard to the deference Liberty Life owed to the opinions of McCabe's treating physicians,

> courts have no warrant to require administrators
> automatically to accord special weight to the

> opinions of a claimant's physician; nor may courts
> impose on plan administrators a discrete burden of
> explanation when they credit reliable evidence that
> conflicts with a treating physician's evaluation.

Medina, 588 F.3d at 46 (quoting Black & Decker, 538 U.S. at

834).  That is, "[a] plan administrator is not obligated to

accept or even to give particular weight to the opinion of a

claimant's treating physician."  Medina, 588 F.3d at 46 (quoting

Morales-Alejandro, 486 F.3d at 700); see also Tsoulas v. Liberty

Life Assur. Co. of Boston, 454 F.3d 69, 77 (1st Cir. 2006).

Thus, "in the presence of conflicting evidence, it is entirely

appropriate for a reviewing court to uphold the decision of the

entity entitled to exercise its discretion."  Medina, 588 F.3d

at 46 (quoting Gannon, 360 F.3d at 216).

     With regard to McCabe's capacity for sitting, Liberty Life

was presented with nothing more than "a garden-variety

conflicting-evidence situation."  Buffonge, 426 F.3d at 28.

Neither McCabe's treating physicians' opinions nor the Oswestry

scores included in McCabe's medical records were entitled to

controlling weight or any other special consideration.  They are

merely evidence that conflicts with other competent evidence

that Liberty Life was entitled to credit.  In sum, Liberty Life

did not act arbitrarily and capriciously by adopting the

opinions of Drs. Monti, Kaplan, and Glassman and rejecting the

opinions of Drs. Hay and Dirksmeier.

**Conclusion**

The bottom line is this.  McCabe has presented a long list of purported flaws in Liberty Life's decision to deny her application for long-term disability benefits.  However, because Liberty Life's decision is both reasoned and supported by substantial evidence, see D&H Therapy, 640 F.3d at 35, the alleged irregularities on which McCabe relies provide no basis for a determination that Liberty Life's decision was arbitrary, capricious, or an abuse of discretion.  Because Liberty Life's decision was not arbitrary, capricious, or an abuse of discretion, the court is compelled to uphold it.  See id. at 34.  Stated in the affirmative rather than the negative, Liberty Life's decision must be upheld because there is a reasonable basis for it.  See Medina, 588 F.3d at 45.  Liberty Life permissibly relied on, among other things, substantial evidence in the form of opinions from Drs. Monti, Glassman, and Kaplan.  While McCabe (and Drs. Hay and Dirksmeier) disagree with the medical opinions on which Liberty Life relied, she has not shown that those opinions were "faulty evidence," Buffonge, 426 F.3d at 30, unworthy of Liberty Life's reliance.

For the reasons given, Liberty Life's motion for judgment on the administrative record, document no. 15, is granted and, necessarily, McCabe's motion for judgment on the record,

document no. 13, is denied.   The clerk of the court shall enter

judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge


Dated:  September 27, 2011

cc:  William D. Pandolph, Esq.
     Vicki S. Roundy, Esq.